UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LANI S. MOAR,

        Plaintiff,

                                         Case No.:  02-CV-40184-DT

vs.

                                         HON. PAUL V. GADOLA
                                         MAG. JUDGE WALLACE CAPEL, JR.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant,

_____/

**REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

      It is recommended that the Court grant Plaintiff's Motion for Summary Judgment in part,

deny Defendant's Motion for Summary Judgment, and remand this case for proceedings consistent

with this Report.

**II.    REPORT**

      This is an action for judicial review of the Defendant Commissioner's final decision denying

Plaintiff's application for supplemental security income [SSI] and disability insurance benefits

[DIB].  Plaintiff filed for SSI and DIB on February 28, 2000,[1] alleging that she has been disabled

and unable to work since December 28, 1999, due to "systemic lupus, coronary spasms, dyspnea,

---

[1]The ALJ stated that she filed for DIB on February 2, 2000, and for SSI on February 28, 2000.  (TR 23).  Plaintiff signed her application for benefits on April 11, 2000.  (TR 56).

[and] weakness." (TR 54-56, 63).[2]  Benefits were denied initially.  (TR 38-43).  A de novo hearing was held on April 16, 2002, before Administrative Law Judge [ALJ] Douglas N. Jones.  (TR 299-347).  In a decision dated May 1, 2002, the ALJ found that Plaintiff was not disabled.  (TR 348-59).  Accordingly, Plaintiff was found not disabled.

On September 13, 2002, the parties stipulated to a remand and the decision was vacated.  (TR 364-67, 368-70).  Another hearing was held on December 15, 2003, before ALJ Douglas N. Jones.  (TR 538-78).  In a decision dated December 19, 2003, the ALJ determined that as of April 1, 2003, Plaintiff was disabled due to marked limitations in her ability to concentrate.  (TR 23-36).  The Appeals Council denied a request to review the decision on February 3, 2005.  (TR 8-10).  The Plaintiff has commenced this action for judicial review.

### A.  PLAINTIFF'S TESTIMONY

#### 1.  April 16, 2002, Hearing

Plaintiff testified that she lives alone in a two story house with a basement in Almont, Michigan.  (TR 302-03).  She stated that she is not currently employed and last worked on December 26, 1999, as a flight attendant.  (TR 303).  Plaintiff reported that she has not received any other compensation since that time, other than her disability insurance in the amount of $1,446.00 a month.  (TR 304).  She stated that she still has health insurance from her employer because she is technically an employee, but on a medical leave of absence.  Id.

She testified that she was born on May 28, 1961.  Id.  She reported that she finished high school and a couple years of college at Mount Hood Community College and Oregon State.  Id.  She

---

[2]The last date of Plaintiff's employment is clearly typed/written on these records as December **28**, 1999.  However, in Plaintiff's testimony of December 15, 2003, she states her last date of employment as December **26**, 1999.  (TR 542).

stated that she is five foot, nine inches tall, and weighs one hundred and forty-four pounds, which is about fourteen pounds more than her usual weight. (TR 304-05). She explained that she started gaining weight when she was put on a medication, Amitriptyline, this past fall. (TR 305).

The ALJ noted at this point in the hearing that Plaintiff seemed uncomfortable sitting in the chair and was told to feel free to stand and move around if necessary. Id. She stated that she has forty percent bone loss in her hips that cause severe pain and makes it hard to sit for extended periods. (TR 311, 324, 327). She later stated that the pain in her hips is an eight on a scale of one to ten, with ten being the most extreme pain. (TR 324). She explained that the pain is constant and even if she does "absolutely nothing . . . it'll hurt." Id. She stated that the Vicodin does not eliminate the pain; rather "[i]t takes the edge off." Id. She stated that she is most comfortable "laying down and sitting very still." (TR 327). She stated that she can sit about fifteen minutes before she wants to get up. Id.

Plaintiff reported that she has a Michigan driver's license, which she renewed on her birthday of the previous year. (TR 305). Plaintiff testified that she drives once every two weeks on average to the grocery store, doctor's, or to her friend's about thirty-five or forty minutes away in Troy. (TR 305). She stated that she sometimes has someone else drive her to go grocery shopping if she is "feeling really bad." (TR 306). Plaintiff reported that she does not buy large quantities of groceries and does not cook very much. Id. She stated that when she gets home she immediately puts away the things that need to stay cold, but then has to sit or lay down to rest due to her fatigue. (TR 326). She stated that she puts "things away sporadically. I can't do it all at once." Id.

Plaintiff submitted a list of medications to the ALJ at the hearing that she takes as prescribed. (TR 306-07). Plaintiff testified that she had surgery on May 7, 2001, because she had brain bleeds.

(TR 307).  She stated that prior to the surgery she had two strokes; one in November of 2000, and the second in February 2001.  (TR 328).

She explained what she experienced with her strokes:

[b]ad head pain, stiff neck, I couldn't move it either way, huge chest pains, felt like an elephant was sitting on my chest, couldn't breath.  Five days after, actually I spent nearly five days on my fours, hands and knees on my bed trying to breath.  For some reason, what ever it hit [sic] when it bled I could not regulate my breathing.  The second time I had the stroke, it was down the side of the head, neck, extreme nausea and shaking fits, which I do went I, [sic] I still do when I get bad pain, nervous, I shake.  Bad, bad nausea.  I lost the use of my left side of my body for a period of about 12 hours.  After that it was hard for me to use it.  I would try to pick up a fork and I would, I had forgotten how to pick up a fork.  So, I'd be picking it up like this rather than what I was used to doing.  So what I found is, I had to kind of rehabilitate myself back into doing this normal things that people take for granted.

(TR 328-29).

She explained that she believes that she had "inflammation in the blood vessels in the brain caused by [her] lupus."  (TR 307-08).  She stated that the doctors could not rule out whether it was actually caused by the lupus.  (TR 308).  She further explained that "what bled in [her] brain is called a cavernous (Phonetic) malformation.  It's a tangle of blood vessels that are normally, that normally don't cause a problem with people and apparently . . . once they start bleeding they keep bleeding."  Id.  The surgery in May 2001 was meant to correct the problem and since same, she has not had any bleeding.  Id.      Plaintiff testified that she since her surgery the strokes have affected her ability to read, maintain concentration, and her ability to speak.  (TR 327).  She explained that "the glare of the pages hurt [her] eyes," she forgets what she has read, has to re-read, and has a hard time comprehending material.  (TR 327-28).  She stated that she has trouble concentrating and speaking daily.  (TR 328).

4

She stated that she has not been hospitalized since May 7, 2001; however, she has gone to the emergency room, but has not been admitted.  (TR 308).  She stated that she went to the emergency rom because she thought she had another brain bleed due to a "[s]tiff neck, bad headache, chest pains, [and] nausea."  (TR 309).  However, she stated that she had pressure and swelling in the blood vessels in her brain, but not another bleed.  Id.  She reported that her daughter drove her to the emergency room.  Id.  She stated that her daughter lives in Oregon, but lived with her at the time.  (TR 309-10).

Plaintiff reported that she sees three doctors on a regular basis, and has a total of four doctors treating her.  (TR 310).  Plaintiff testified that she is currently under the care of Dr. McCune, a rheumatologist; Dr. Bowers, a cardiologist; and Dr. Thompson, a neurologist.  Id.  She stated that she sees an internist, Dr. Orsete, as well.  Id.  She reported that all of the doctors are at the University of Michigan [UMMC], except for the cardiologist, which is in Troy, Michigan.  Id.

Plaintiff described her medical diagnosis.  (TR 310-12).  She reported that she has "scarring in [her] heart that prevents oxygen getting to [her] extremities."  (TR 310).  She stated that she has not had a heart attack but has had to take nitro-glycerine about once week during the last three months for chest pain.  (TR 311).  She stated that this is an improvement since she stopped working.  (TR 322).  She explained that she used to take six nitro-glycerine tablets a day to reduce the pain.  Id.  She reported that the chest pain started randomly, but now it occurs with exertion, which includes any physical activity such as walking up or down stairs and gardening.  (TR 312, 322).  She stated that she had not mowed her lawn in two years.  (TR 326).  She explained that she also has numbness in her arms when she walks up stairs, even if she is not using her arms or hands.  (TR 323).

Plaintiff testified that she gets shortness of breath with the chest pain as well as with muscle fatigue ache [sic] in her shoulder, elbow, and from her hip to her knees. (TR 322). She testified that the shoulder and elbow pain sometimes accompany her chest pain, but also come independently. (TR 323). She stated that she has documented coronary spasms that cause her chest pain. (TR 323-24).

She stated that she believes the shortness of breath is from her heart problems and occurs "when [she] push[es] [her]self and try to get up and do something that a normal person would do." (TR 322). She stated that she does not smoke cigarettes. (TR 312-13).

Plaintiff again discussed her diagnoses. (TR 311-12). She stated that she had documented coronary spasms and brain oxygen drawn peripheral spasms. (TR 312). She explained that "everything's going to inflamation in [her] cerebral vascular system" and "[t]hat is the focus of the Lupus." Id. She explained that her systemic lupus attacks her bone, muscle, and organ tissue. (TR 311).

Plaintiff described a typical day:

> I'll wake up 8:30 or 9:30. I will make coffee. I have a cat and a bird I'll feed. I can putter around for an hour doing miscellaneous house chores. In the last couple of months, it's become increasingly more difficult for me to do house chores. I've learned to, to unload the dishwasher in three shifts. I've learned that I can't, I can not maneuver myself up a stairways and carry things. In the beginning, when I moved into this house, I used to put a laundry basket at the top of the stairs and at the bottom of the stairs. Now, I'm finding I can't use the laundry baskets because it's too awkward and too heavy and I really need the hand rail. From that I will usually, if it's an average [sic] bad day around 11:00 I'll lay down until noon. During that time I may rest, I may just lay there comfortably.

(TR 313). She added that she lays in her bedroom and usually sleeps a lot during this rest period from 11:00 to 12:00. (TR 313-14). After her nap, she has

a bowl of cereal, typical day putts [sic] around the house for another hour, hour and a half. At, usually by 3:00 I am back down for a nap, if not between 1:00 and 3:00 between 3:00 and 7:00. So I usually take two naps a day. I am back in bed by 2100 which is 9:00.

(TR 314). She clarified that on a bad day she takes an additional nap from 3:00pm until 7:00pm; however, regardless she stated that she naps everyday between 10:00am and 12:00pm and 1:00pm and 3:00pm. Id. She stated that her rheumatologist, Dr. Melvin Bretton, told her that she had to nap regardless of whether she thought she needed to in order to help control the disease. (TR 325). She stated that on a typical day, she can only tolerate about an hour of physical exertion. (TR 326). She stated that she does not typically eat dinner. (TR 314). Rather, on a typical day, she reported that she has cereal or sometimes a sandwich around 4:00pm if she is hungry. Id.

She stated that her ability to sleep through the night depends on her pain level. Id. She reported that "recently [she] had extreme leg pain and hip pain along with head pain." (TR 314-15). Therefore, she laid "in bed with [her] legs up on a pillow and ice bag on [her] head with pain killer on board just to get through the pain." (TR 315). She reported taking "Vicodin as needed for pain," as well as Moveck and Flexeril. Id. She stated that she typically takes three or four Vicodin pills a day. Id. She reported that her neurologist and rheumatologist prescribe the Vicodin, which she stated that doctors have not tried to decrease in dosage. Id. Rather, Dr. McCune stated that if she needed more Vicodin to call him. Id.

Plaintiff stated that Dr. McCune wanted her to see a neurologist very soon because she had inflammation in her blood vessels in her brain and he knew that Dr. Thompson has referred her to a neurologist to deal with her headaches. (TR 315-16). She stated that subsequently she had the surgery which helped with the headaches for three or four months, but then the headaches increased.

(TR 316).  She stated that her pain became more serious and she started calling and complaining about the pain, which she stated is unusual for her to do.  Id.

She later explained that she has "had a continuous headache since November 2000.  (TR 324).  She reported that she has it "[e]very hour of every day.  It peaks, it's peaked as high as eight, nine.  At that, when it starts getting to be like a six, I can't even open my eyes.  Light hurts my eyes, got pain [sic] behind my eyeballs."  Id.  She testified that during the hearing, her headache was "a two and a half."  Id.  She stated that it had been at the level for the prior week, but "prior to that it was up to an eight for nearly two weeks."  (TR 325).

Plaintiff stated that she was scheduled to go to a pain clinic twice, but was prevented from doing so both times.  (TR 316).  She stated that a brain bleed stopped her from going as well as heart problems.  (TR 316-17).

Plaintiff testified that she also suffers from

peripheral (Phonetic) fasal spasms and what that is is the blood doesn't go to the tips of [her] fingers and they turn blue and numb.  And there's actually a risk of that and it actually happen [sic], it actually does happen when your trying to grip things or carry things or they can also happen in cold weather, sporadically on itself, by itself . . . The risk of that is the blood not going back into your fingers.  It cuts off circulation and the tissue dies.

(TR 329).  She stated that she has this problem with her fingers whenever it is cold and otherwise once or twice a week.  (TR 329-30).  She stated that she can still write, but since she has been emailing on the computer, her writing is not as well as it was before.  (TR 330).  She stated she can still grip a glass of milk and a half gallon.  Id.

Plaintiff testified about the details of her previous employers.  (TR 317-21, 325-26, 334-51).  She reported that she last worked for United Airlines.  (TR 317, 325).  She testified that in 1999 Dr. Bretton told her that she had to stop working to cope with her disease.  (TR 325).  She stated that

8

she went on medical leave, but attempted to return to work in June and finally stopped working in December of 1999. (TR 325-26, 331).

She testified that she took "nine medical leaves in ten, eleven years of flying, all of them were Lupus with pericarditis. A couple of times pericarditis with pleurisy which is inflammation of the lining of the lung." (TR 331). She stated that she originally stopped working "in November of [19]98 due to paracardiosis, [sic] which is an inflammation around [her] heart." (TR 326). She later stated that she stopped working because of her "[c]hest, pain, breathlessness, numbness in the side of [her] face, down [her] arm, [and an] inability to walk for 50 feet up [her] driveway." (TR 330).

Prior to her employment with United Airlines, she worked in management at a department store, Marshalls. (TR 317). She stated that it was in Beaverton, Oregon, and she was responsible for five departments, including hiring and firing, but she was not a buyer or responsible for accounting or cashier work. (TR 317, 318). She stated that she scheduled, assigned tasks, and "merchandised or I directed merchandising." (TR 317-18). She explained that she had to leave the job due to illness from being overworked. (TR 318, 320). She explained that she worked about seventy hours a week. Id.

She testified that she then worked in management at Jeffrey Michaels, but had different duties. Id. Plaintiff explained that she managed clients that were models and the company trained the models. (TR 318-20). She explained that the job was strictly administrative, using the phone, and dealt with models and scheduling. (TR 333-35). She stated that she did some bookkeeping, but did not use a computer. (TR 334-35). She stated that she lifted over twenty pounds, but not up to fifty pounds. (TR 334). She stated that she also left that job due to illness; specifically, she had

inflamed bowels, joint pains, low grade fevers, and bad headaches.  (TR 320).  It was at this point that she was sent for a cerebral angiogram and they first thought she might have lupus.  She stated that she then left her job to work at United Airlines as a flight attendant.  (TR 320-21).

She stated that although she had a physical before going to work for United Airlines, she was having mild joint pain, was not diagnosed, and was on "large doses of Motrin," and the company "had no problems with that at all."  (TR 321).  She explained that she loves working with people. Id.  She testified that she was firmly diagnosed with lupus in 1990 with pleurisy and pericarditis. (TR 330, 331).

### 2.     December 15, 2003, Hearing

Plaintiff testified that she has lived in Almont, Michigan, since August 1999.  (TR 541-42). She stated that she last worked for United Airlines December 26, 1999;[3] and, she has not worked since that date.  (TR 542, 559-60).  She stated that she still receives long-term disability from United Airlines, but no longer receives health insurance benefits because she was terminated in October. (TR 542)  She stated that she is paying COBRA for health insurance at the present time until those benefits expire.  (TR 543).

Plaintiff testified that she worked for fourteen years at United Airlines and loved her job. (TR 551).  She stated that she was attracted to the work because she enjoyed helping others and interacting with people.  Id.  She stated that she would love to be able to work.  (TR 560).  She stated that she cannot return to her work due to her fatigue, heart problems, lupus, and pain.  (TR 551-52, 560).  She stated that she could not work an eight-hour day because she "would be dead in a couple

---

[3]The undersigned notes that this date of December **26**, 1999, stated by Plaintiff is not the same as reported on TR's 54 and 63, which is December **28**, 1999.

of weeks to a month." (TR 560). She explained that when she goes down to Ann Arbor for a doctor's appointment and has a test lasting approximately for about four or five hours, she hurts and is exhausted for the next three days and rests. (TR 560-61).

She stated that the lupus limits her upper body movement because she has "scar tissue in [her] chest wall and that irritates it." (TR 552). She explained that the "more [she] move[d] around during the day the more [her] headaches get worse." Id. She stated that lifting, carrying, walking, and riding in the car with the vibrations cause swelling, pain, and headaches. Id.

Plaintiff explained that she is receiving help from two flight attendant foundations with her medical expenses. (TR 543). She stated that she does not receive any benefits from the Family Independence Agency. Id. She testified that she still has a driver's license, but stated that she only drives when she has to, to the post office or for groceries, up to once or twice a month. Id. She stated that her friends often take her to her doctor's appointments. Id. She stated that she has not taken any trips out of state in the last two years. (TR 544).

Plaintiff testified that she goes to Ann Arbor for her treatment because she believes they are the best doctors. Id. She stated that she usually has a friend drive her there because it is sixty miles from her home. Id. She stated that her attorney also went with her once. (TR 545).

Plaintiff also testified that she settled in Michigan because she had a relationship with a married man and the relationship ended about two and a half years prior to the hearing. Id. She stated that it affected her stability and economic situation. Id. She stated that she does not own her house outright, but makes "payments like everybody else." Id. She explained that prior to the breakup, she was getting help with her monthly payments. (TR 545-46).

11

Plaintiff testified that she had surgery for what Dr. Thompson and Dr. McCune called a stroke.  (TR 546).  She explained that she had an injection under her skull and that "[t]he problem from the surgery is [her] osteopenia has not allowed the bone flap, where they cut [her] skull open, to heal.  And so that clicks with movement of [her] face or laying down."  Id.  She stated that she received the "shot to help with pressure headaches."  She stated that they recommended that she use ice and she also reported taking painkillers for her head pain.  Id.  She indicated that the pain is from where the bone flap surgery was performed "above [her] hairline on the right side of [her] head."  (TR 546-47).

She stated that she was wearing an ice pack at the hearing to help with nausea that is caused by a pinched occipital nerve that causes eye pain and light sensitivity.  (TR 547, 558).  However, she indicated that the ice pack does not eliminate the problem.  (TR 547).  She stated that although there was talk of more surgery to fix the bone flap, the hope was that it would heal itself.  Id.  She stated that Dr. Thompson has indicated that the "natural" plates in her skull are not healing.  (TR 548).  She stated that she has "pain down the middle of [her] head" when she lays down at night and "if [she] lay[s] on the back it pains up like [sic] straight up over [her] ears."  Id.  She stated that the doctors opine that her unhealed skull is causing the discomfort.  Id.  Plaintiff testified that she has osteopenia everywhere, which is preventing her skull from healing.  (TR 549).  However, she reported that it is the worst in her hips.  Id.

She explained that the osteopenia makes sitting and walking hard.  (TR 553).  She stated that she cannot sit on one side of her hip or take long walks.  Id.  If she does walk far or repeatedly, she reported that she gets bursitis, joint inflamation and takes quinidine, Flexeril, and Mobic regularly to help with same.  (TR 553-54).  However, she continues to have symptoms even with the

medications.  (TR 554).  She stated that she takes Fosamax regularly for her osteopenia.  Id.  She also takes Imdur, Norvasc and nitroglycerine regularly for her heart condition.  Id.

She testified that her lupus causes joint pain in the knuckles in her hands, her big toes, hip, knee, and occasionally bursitis in her shoulder.  (TR 558).  She also reported inflammation in her wrist from pulling weeds for an hour.  Id.

Plaintiff reported that she is still living alone and is able to dress, bathe, and feed herself most days.  (TR 549).  She reported that many times when she bathes, she gets exhausted and just lays down afterward.  Id.  She stated that she does not read very often because she has trouble concentrating and remembering things.  (TR 550).  She stated that her concentration difficulties began after her stroke in February 2001.  (TR 565).

She stated that she is not seeing a psychologist or psychiatrist.  (TR 549, 562).  She reported that other than the social security referral to a mental health professional, she has not seen a psychologist or psychiatrist in the last two years.  (TR 549-50).  Plaintiff reported that no one has recommended that she see a psychologist or psychiatrist.  (TR 562).  She stated that she had not had any ongoing treatment for her stroke in May 2001.  (TR 561-62).  However, she stated that she has a specific physical therapy program once a month at the UMMC in Ann Arbor.  (TR 562).

She stated that she only cooks easy things for herself because she has trouble following recipes.  (TR 550).  She reported that her friend Linda brings her food and occasionally cooks for her.  Id.  Plaintiff stated that Linda lives five minutes from her house in downtown Almont.  Id.  She reported that she does not get the newspaper at home because she has a post office box and it is hard to go to the post office every day.  Id.  She stated that she has to stop walking every twenty-five feet due to her sinus tachycardia, if she walks to the post office.  (TR 551).  She explained that there is

13

"a tumor of connective tissue cells that's in [her] mitral valve." Id.  She also stated that her "atrium is expanding [and her] mitral valve is thickened and has excessive leaflet tissue [and] is borderline prolapse." (TR 555, 556).  She stated that she also has shortness of breath.  (TR 553).

She stated that she gets up in the morning around 8:30 or 9:00 and she has to lay down by 1:00 until 4:00 due to fatigue.  (TR 552).  She stated that if she does not lay down she gets progressively worse with more pain and continued pain the following day.  Id.  She stated that her primary limiting factors relating to daily activities are head pain, chest pain, and fatigue.  (TR 552-53).

Plaintiff explained that she has two types of chest pain:  "from twisting [her] torso too much," and from her sinus tachycardia.  (TR 553, 556).  Plaintiff testified that the nitroglycerin helps to relieve her chest pain in her heart and Vicodin helps with the chest wall pain.  (TR 553).  She explained that she has had the sinus tachycardia for about three years and stated that she recently had a test showing it both at rest and with activity.  (TR 555).

Plaintiff testified that she has pericarditis repeatedly and received injections from Dr. Kelly in her neck once a month for headaches.  (TR 556, 557).  She reported that the injections are painkillers and provide three weeks of relief, although they are supposed to provide relief for a month.  (TR 556-57).

She explained that the headaches cause pain behind her eyes and cranial pressure.  (TR 558).  She stated that the pain from the bone flap is different than the pain in her neck.  Id.  She explained that "if I raise my eyebrows, it will click.  If I shampoo my hair, just by doing this it clicks.  The more it clicks and moves the more pressure builds and then the worse the headaches gets.  That - -

14

in with that is nausea and the eye pain.  And then the nerve problem makes the eye pain aggravated worse."  (TR 558-59).

Plaintiff testified that she is currently under the care of Dr. McCune, a rheumatologist, Dr. Bowers, a vascular cardiologist, and Dr. Thompson, a neurologist.  (TR 559).  She stated that Dr. McCune acts as her primary care physician due to the nature of her disease.  (TR 561).  She stated that she sees Dr. Thompson every six months for an MRI to check her AVM's for inflammation and expansion.  (TR 559).  Plaintiff stated that it is her understanding that the damage from her lupus is the cause of her various medical conditions.  Id.  She explained that the lupus "attacks organs, or muscle, bone tissue and [causes] inflammation."  Id.  She stated that "then what happens is the connective tissue cells kind of congregate around that and then it builds scar tissue."  Id.

### B.    MEDICAL EVIDENCE

Examinations of the parties' cross-motions for summary judgment reveal that an additional recitation of the Plaintiff's medical evidence would be repetitive.  The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[4]

### C.    VOCATIONAL EXPERT'S TESTIMONY[5]

Dr. Robert Fritzen, a vocational expert, testified at the hearing.  (TR 563-78).  He testified that cognitive disorder, NOS, was documented in the record and that it was noted that she may have an anxiety disorder and posttraumatic stress disorder, but no indication of a formal diagnosis.  (TR 566).  The VE also stated that he did not see any mental health expert evaluations within the record,

---

[4]See Subpart E, infra.

[5]Plaintiff is not challenging any aspects of the vocational expert [VE]'s testimony from the April 16, 2002, hearing; therefore, only the VE's testimony from the December 15, 2003, hearing will be summarized here.

15

other than a consultive exam in 2003 by a Social Security designated healthcare provider.  (TR 566-67).

  The VE testified that the cognitive disorder did not meet or equal any of the medical listings by itself under Listing 12.02, organic mental disorder.  (TR 567).  The VE stated that he believed that Plaintiff's global assessment of functioning [GAF] score of 45 was based on her Axis I and Axis III issues, namely her physical and financial problems.  Id.  The VE opined that the 2003 mental evaluation by Social Security "was pretty much a base evaluation at best and does not provide a great deal of information associated with her cognitive functioning.  (TR 568).  The VE added that neurological testing would help develop the record in terms of Plaintiff's memory and ability to maintain concentration.  (TR 568-69).

  The VE testified based on the limited information regarding Plaintiff's cognitive ability, she is not limited in the following areas:  ability to understand and remember short simple instructions; ability to understand and remember detailed instructions; ability to sustain an ordinary routine without special supervision; ability to interact appropriately with the general public; ability to ask simple questions or request assistance; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and ability to be aware of normal hazards and take appropriate precautions.  (TR 570-72).  The VE testified that she is markedly limited in the following areas:  ability to carry out detailed or short simple instructions and concentrate and maintain attention for extended periods of time; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without - - with a reasonable number and length of rest periods.  Id.  Further, the VE

testified that she is moderately limited in the following areas: ability to perform activities within a schedule and maintain regular attendance, and be punctual within customary tolerances; ability to work in coordination or proximity to others without being distracted, to make simple work-related decisions; ability to interact appropriately with the general public; ability to make simple work-related decisions; ability to respond appropriately to changes in work setting; and ability to set realistic goals and make and perform independent planning. Id. However, the VE was unsure, or did not have enough information to determine Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors and her ability to travel to unfamiliar places or use public transportation. (TR 571-72). Nevertheless, the VE assumed that she would not be limited regarding same. Id.

Plaintiff's counsel questioned the VE. (TR 573-74). The VE testified that is a combination of Plaintiff's disease and her symptoms, rather than her cognitive function alone that would be most problematic in a work setting. (TR 573).

The ALJ asked whether the VE's testimony would be generally consistent with the Dictionary of Occupational Titles unless otherwise stated. (TR 574). The VE answered affirmatively. Id. The ALJ asked the VE to assume a claimant with Plaintiff's age, education, and work experience and to further assume that such a claimant

> limited to sedentary work that required lifting or carrying of no more than five pounds and involved only occasional bending at the waist or bending at the knees, occasional kneeling, occasional crawling, occasional climbing of stairs. No climbing of ladders. No exposure to unprotected heights or uncovered moving machinery. No use of vibrating tools. No exposure to dust, fumes, airborne pollutants greater than would be encountered in a typical indoor environment - - clean air environment that complies with OSHA regulations. No exposure to very hot or very cold temperatures. No exposure to high humidity or constant wetness. And no detailed instructions and no extended periods of concentration or attention. And by that I mean that there is no single task that would require more than five minutes to understand and to

17

mentally process or even to focus on for more than five minutes although there can be many task of - - simple short duration tasks to do during the day. There would be only occasional interaction with members of the general public and occasional changes in work setting and procedure or occasional need for independent planning or decision-making.

(TR 575). The VE testified that under such a hypothetical the claimant could not perform her past relevant work. Id. The ALJ asked the VE whether Plaintiff had any transferable skills consistent with the aforementioned limitations. (TR 576). The VE indicated that she did not. Id.

The ALJ asked the VE whether there were any other unskilled jobs that would be consistent with the hypothetical. Id. The VE testified that the following unskilled full-time jobs existed: inspector, 2,000 positions; offline bench assembler, 7,000 positions; and, reduced range of order clerk/checker, 4,500 positions. Id. The ALJ proposed "an additional limitation on their ability to complete a normal workday and workweek, so that the net effect of that problem would be that they would miss the equivalent of eight hours, or one day's work per week." Id. The VE testified that such an additional limitation would eliminate the aforementioned positions and that there would be no work that such an individual could perform. Id.

## D.   ALJ'S CONCLUSIONS[6]

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that

> [t]he medical evidence documents the presence of impairments best described as: lupus erythematosus; status post cardiovascular accidents (February 2001) with mild residual left sided weakness; status post cranial surgery for resection for a cavernous malformation (May 2001); pericardial effusion with cardiac arrhythmia; mitral valve prolapse; fibromyalgia, early osteopenia; a history of depression; and a cognitive disorder, N.O.A.,

---

[6]Plaintiff is not challenging any aspects of the ALJ's May 1, 2002 decision; therefore, only the ALJ's December 19, 2003, decision will be summarized here.

but she does not have an impairment either alone or in combination, sufficiently severe to meet or medically equal the criteria of any condition in the Medical Listings in Appendix 1, Subpart P, Regulations No. 4.  (TR 29, 34).  The ALJ found Plaintiff's "allegations regarding her limitations are not entirely credible with respect to the period before April 1, 2003, for the reasons set forth in the body of the decision.  Since April 1, 2003, however, the claimant's allegations of disabling symptoms and limitations are generally credible."  (TR 30, 34).  The ALJ determined that prior to April 1, 2003, Plaintiff was capable of a limited range of sedentary work, but after that date due to "additional functional limitations of no fast paced work, no work that requires close supervision, and the inability to maintain sufficient concentration, persistence or pace to sustain fulltime work," she could no longer perform same.  (TR 32-33, 35).  Thus, he determined that Plaintiff was entitled to DIB and SSI "beginning April 1, 2003, but not at any time prior to that date."  (TR 33, 35).

## E.   ANALYSIS

Plaintiff advances one claim in her Motion for Summary Judgment, makes one objection, and incorporates her "Statement of Exceptions."  (TR 11-16).  Her Motion argues that the ALJ's decision incorrectly denied SSI and DIB prior to April 1, 2003, because the ALJ failed to give proper weight to the primary treating physician and substituted his own medical opinion; and Plaintiff "objects to the decision to conduct ongoing medical review of this matter."[7]  In her Exceptions, Plaintiff also argues that she does not have depression and that the ALJ's assessment of her credibility is improper.  (TR 13-14, 15-16).  In response, Defendant's Motion for Summary

---

[7]Plaintiff's Motion for Summary Judgment and Brief filed August 8, 2005 (hereinafter "Plaintiff's Brief"), at pages 1-4.

Judgment contends that Plaintiff waives several arguments and the ALJ's decision is supported by substantial evidence.[8]  The matter is now ready for decision.

### 1.    <u>Standard of Review</u>

The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g) (1997).  Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  It is more than a scintilla of evidence, but less than a preponderance of evidence.  <u>Brainard v. Sec'y of Health and Human Servs.</u>, 889 F.2d 679, 681 (6th Cir. 1989).

This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035 (6th Cir. 1994).  Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence.  <u>Mullen v. Bowen</u>, 800 F.2d 535, 545 (6th Cir. 1986).  Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted.  <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998); <u>see also</u> <u>Thacker v. Comm'r of Soc. Sec.</u>, 99 Fed.Appx. 661, 665 (6th Cir. 2004) (unpublished).  Applying these standards, I will analyze each of Plaintiff's claims.

---

[8]Defendant's Motion for Summary Judgment and Brief filed September 29, 2005 (hereinafter "Defendant's Brief"), at pages 5-12.

a.      **Treating Physician**

Plaintiff argues that the ALJ did not properly analyze her treating physician, W. Joseph McCune's, opinion.[9]  This Court is well aware that the medical opinions and diagnoses of treating physicians are entitled to substantial deference, particularly if those opinions are uncontradicted. King v. Heckler, 742 F.2d 968, 974 (6th Cir. 1984).

> The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.

Bankston v. Comm'r of Soc. Sec., 127 F.Supp.2d 820, 824 (E.D. Mich. 2000).  However, such deference is due only if the treating physician's opinion is based on sufficient medical data.  See 20 C.F.R. § 404.1529.  It is often misunderstood that the determination of disability is the prerogative of the Secretary, and not the treating physician.  Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 538 (6th Cir. 1981); Duncan v. Sec'y of Health & Human Servs., 801 F.2d 847, 855 (6th Cir. 1987); 20 C.F.R. § 404.1527.

An ALJ may reject a physician's opinion when it is brief, conclusory, or not supported by medically acceptable clinical or laboratory diagnosis techniques.  20 C.F.R. § 404.1527(d)(2).  Accordingly, treating physicians' opinions must be grounded on objective medical evidence, and no deference need be afforded those opinions if they are simply conclusory.  Houston v. Sec'y of Health and Human Servs., 736 F.2d 365, 367 (6th Cir. 1984); Duncan, 801 F.2d at 855 (citing King, 742 F.2d at 973).  In other words, the weight to be given a doctor's opinion by an ALJ will depend on the extent to which it is supported by "specific and complete clinical findings."  Giddings v.

---

[9]Plaintiff's Brief at page 3.

Richardson, 480 F.2d 652, 656 (6th Cir. 1973).  See also  Cutlip v. Sec'y of Health and Human

Servs., 25 F.3d 284, 287 (6th Cir. 1994) (citing Young v. Sec'y of Health & Human Servs., 925 F.2d

146, 151 (6th Cir.1990)).

In Wilson v. Comm'r. of Soc. Sec., 378 F.3d 541, 544, (6th Cir. 2004), the Sixth Circuit found

that

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must
> apply certain factors--namely, the length of the treatment relationship and the
> frequency of examination, the nature and extent of the treatment relationship,
> supportability of the opinion, consistency of the opinion with the record as a whole,
> and the specialization of the treating source--in determining what weight to give the
> opinion.

Id. (citations omitted).  Defendant argues that

> Because Plaintiff makes no attempt to support her assertions with reference to the
> specific medical evidence or other record evidence or to develop her argument in
> more than a perfunctory manner, she has essentially waived these issues. Cf.
> Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp., 26 F.3d 375, 398 (3rd Cir.
> 1994) (providing that a passing reference to an issue without discussion does not
> bring issue before court); United States v. Zannoni, 895 F.2d 1, 17 (1st Cir. 1990),
> cert. denied, 494 U.S. 1082 (1990) (explaining the "settled appellate rule that issues
> adverted to in a perfunctory manner, unaccompanied by some effort at developed
> argumentation are deemed waived."). Because Plaintiff has failed to develop or make
> more than a passing reference to her arguments without specific citations to the
> record, this Court should reject her claim.[10]

However, Defendant seems to ignore the fact that Plaintiff incorporated her Statement of Exceptions

to the Appeal Council.  (TR 11-16).[11]  The Statement of Exceptions outlines the areas of the ALJ's

decision with which Plaintiff disagrees regarding the issue of the treating physicians' opinions and

medical evidence.

---

[10]Defendant's Brief at page 6.

[11]Plaintiff's Brief at page 2.

22

In the Statement of Exceptions, Plaintiff makes references to Dr. Weg and Plaintiff's pulmonary function as well as conclusory opinions regarding the ALJ substituting his opinion for that of the physicians of record. (TR 11-16). However, as argued by Defendant, Plaintiff's arguments are undeveloped. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997) (citations omitted). Thus, these superficial arguments are deemed waived.

However, Plaintiff does allege that Dr. McCune is her treating physician and makes reference to Dr. Bowers.[12] (TR 12). Although the ALJ stated that she did not have a primary care physician, (TR 25), the ALJ was aware that Dr. McCune found Plaintiff disabled. (TR 27, 28, 29, 31). The undersigned recognizes that the Regulations clearly state that, "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(e)(1).

Nevertheless, if an ALJ does reject the opinion of a treating physician, he or she must give "good reasons" for doing so. Wilson, 378 F.3d at 544. The ALJ did discuss the weight given to Dr. McCune's opinion, specifically, he stated that Dr. McCune

> [a]lone among his colleagues at the University of Michigan Clinic, has opined that, despite the claimant's "good recovery," from her February 2001 stroke, she was too fatigued to perform even sedentary work 8 hours a day (Exhibit 9F10). On November 27, 2002, Dr. McCune again opined that the claimant could not maintain full time employment because of multiple illnesses (Exhibit 12F1). These opinions are based largely upon the claimant's subjective reports of continued fatigue, chest pain, arthralgias, headaches, and cognitive dysfunction, however, and are

---

[12]Plaintiff's Brief at page 3.

23

> unsupported by objective clinical findings or test results that might verify these complaints. Although she may be a candidate for further cranial surgery, the claimant has essentially recovered from her stroke, and does not experience significant lupus symptoms when she follows her prescribed medication regimen. Accordingly, Dr. McCune's opinion regarding the claimant's inability to perform any full time work activity has received reduced weight.

(TR 31). Further, the ALJ found that the DDS medical consultant provides further support for his finding that prior to April 1, 2003, Plaintiff was capable of a limited range of sedentary work because same concluded that she was capable of light work on June 27, 2000. (TR 32). The ALJ found that

> [t]he claimant's ability to perform a limited range of sedentary work is further supported by the opinion of the DDS medical consultant who evaluated the medical evidence available to DDS June 27, 2000 and concluded she could perform a limited range of light work (Exhibit 7F). Because it contains the opinion of a qualified physician with expertise in the evaluation of the medical issues in disability claims under the Act, Exhibit 7F is entitled to consideration and provides some support for the conclusion that the claimant's impairments are not as limiting as she asserts. Nonetheless, because the DDS examiner had no opportunity to examine, interview or observe the claimant, and because additional evidence has been received since June 27, 2000, Exhibit 7F was given less than full weight in establishing the claimant's residual functional capacity. *See* 20 CFR § 404.1527(d) and § 416.927(d) (evaluation of medical opinions).

(TR 32). However, it is unclear how the DDS consultation can support the ALJ's finding but be of little weight. Further, the ALJ does not assess Dr. Bowers or Dr. Britton's opinion that Plaintiff is disabled. (TR 231, 234). Defendant argues that Dr. Bowers's records show only "mild findings" and that there is nothing in the record to support Plaintiff's suggestion that Dr. Bowers or any other physicians provide support for Dr. McCune's opinion of disability.[13]   However, on February 9, 2000, Dr. Bowers found that Plaintiff was disabled as of December 1999, until that present date due to chest pain and presumed coronary spasm. (TR 234). On July 13, 2000, Dr. Britton found

---

[13]Defendant's Brief at page 10.

Plaintiff incapable of "any prolonged activity" and provided that a positive ANA test was objective evidence of her chronic fatigue syndrome.   (TR 231-32).

Further, Defendant argues that Dr. McCune's statements that Plaintiff's lupus is inactive contradicts his opinion that she is disabled.[14]  However,

> the mere fact that a condition is stable does not mean that it cannot be disabling.  <u>See Gude v. Sullivan</u>, 956 F.2d 791 (8th Cir.1992), which found that the symptoms from a stable condition of Systemic Lupus Erythematosus (SLE) could be disabling even when the condition was in remission and stabilized when plaintiff continued to have the symptoms of arthritis, pain in the joints, kidney and blood disorders, skin eruptions, and fever.

<u>Reed v. Sec'y of Health and Human Servs.</u>, 804 F.Supp. 914, *921 (E.D.Mich.,1992).  Defendant also argues that "Dr. McCune reported that Plaintiff's lupus had 'always' been of a questionable diagnosis."[15]  However, Defendant correctly states later in its brief that it was in fact Dr. Orsetti who was the doctor to state same.[16]  Dr. McCune is a Professor of Medicine and a rheumatologist, an expert in such areas as lupus, whereas there is no evidence that Dr. Orsetti has any specialty in this regard.  (TR 279-80).  The opinion of such a specialist would be entitled to more weight than a non-specialist, especially when the specialist is the doctor that Plaintiff refers to as her primary care physician.

Therefore, the ALJ's failure to discuss the other opinions of disability appear to be in error. It is recommended that upon remand, the same be considered.

---

[14]Defendant's Brief at pages 6-7, 9, 10.  Defendant mentions a "Dr. Newman," which the undersigned assumes is actually a reference to Dr. McCune.  Defendant's Brief at page 7.

[15]Defendant's Brief at page 8 citing TR 273.

[16]Defendant's Brief at page 10.

### b.      Credibility

Plaintiff alleges in her Statement of Exceptions that the ALJ improperly assessed her credibility.  (TR 13-14, 15-16).  Defendant does not address this argument as previously mentioned, and Defendant fails to recognize or respond to Plaintiff's incorporation of the Statement of Exceptions to the Appeals Council.  (TR 11-16).  Nevertheless, the undersigned will evaluate Plaintiff's credibility argument.  Plaintiff argues that her symptoms were verifiable by objective medical tests and that there is no more aggressive treatment for her disease.  (TR 13-14).  Further, she reiterates that the ALJ substituted his opinion for that of doctors in making a credibility determination.  (TR 15-16).

In evaluating subjective complaints of disabling pain, this court looks to see whether there is objective medical evidence of an underlying medical condition, and if so then, 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  McCoy on Behalf of McCoy v. Chater, 81 F.3d 44, 47 (6th Cir. 1995) (quoting  Stanley v. Sec'y of Health and Human Servs., 39 F.3d 115, 117 (6th Cir.1994) (citing Jones v. Sec'y of Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir.1991) and (quoting Duncan, 801 F.2d at 853).

In order to determine disability based on subjective complaints, we look to 20 CFR § 404.1529(c)(3) and the following factors:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain

26

or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

As Social Security Ruling (SSR) 96-7p points out, the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  See also, Murray v. Comm'r of Soc. Sec., 2004 WL 1765530, *4 (E.D. Mich., Aug. 3, 2004) (slip copy).

The ALJ specifically discussed Plaintiff's medical treatment and daily activities.  (TR 24-29).  Further, he stated that

> [t]he claimant's allegations that she can perform no sustained work activity before April 1, 2003, because of shortness of breath, chest pain, fatigue, extremity weakness, lower extremity pain and lack of concentration are not fully credible. They are inconsistent with the objective medical evidence, the absence of more aggressive treatment and the claimant's ordinary activities.  She continues to take non-steroidal medications for lupus (Exhibit 5E6), but, despite Dr. McCune's preference for describing it as "active," that disease has produced minimal symptoms since the alleged onset date (e.g., Exhibit 9F16) and on January 2002 Dr. Orsetti opined that lupus was a "questionable diagnosis" (Exhibit 9F3).  No musculoskeletal abnormalities were observed during the claimant's May 1, 2003 consultative examination, were she was described as being "fully intact" without swelling, inflammation or deformation (Exhibit 16F5).
>
> No clinical evidence of pulmonary disease was present on December 5, 2000, and Dr. Weg believed the claimant was merely de-conditioned (Exhibit 9F21).  On April 2000, Dr. Schmidt noted "no significant heart disease" despite the presence of mitral valve prolapse (Exhibit 8F10).  On August 2003, Dr. Bowers found no correlation between the claimant's complained [sic] of symptoms and the cardiac arrhythmias documented on a Holter-Monitor test (Exhibit 18F2).  An August 20, 2003 echocardiogram performed at Dr. McCune [sic] request was essentially normal (Exhibit 17F1).
>
> The medical evidence documents no rehabilitative therapy after the February 2001 cardiovascular accidents, and the claimant had no motor or sensory deficits, and no nausea, vomiting or weakness after her May 2001 craniotomy (Exhibit 9F14).  July 2000 studies confirmed that the claimant had not had pericarditis (Exhibit 8F95).

27

The most recent evaluation of the claimant's osteopenia showed it to be in "early" stages (Exhibit 9F3) and does not document the presence of that condition in her skull.  On December 2001, the claimant's hip and shoulder symptoms were probably related to tendonitis (Exhibit 9F5).  Vicodin was recently prescribed for headaches on an as needed basis (Exhibit 10E), but no physician has identified the source of the headaches or indicated that they prevent the claimant from driving, cooking, reading, or otherwise concentrating on simple stress tasks.  No significant rehabilitative therapy was recommended or provided for residuals effects of the claimant's February 2001 strokes or May 2001 craniotomy, and the record contains no physical examination that clearly identifies or measures what those sequelae might actually be.

The depression reported in late 2001 was situational in nature and medication prescribed to treat it was discontinued after a few months.  No further mental health treatment has been recommended, and on April 7, 2003, the claimant denied feeling particularly depressed (Exhibit 15F).  Despite the uniform inability of treating physicians, including Dr. McCune, to identify causes for most of the claimant's complaints of pain and fatigue, no referral has been made for a pain clinic or similar facility, and no specialized mental health treatment has been recommended, sought or provided.  A significant somatoform disorder may well be present that might account for some of the claimant's inaccurate descriptions of her medical history, but no examining or treating physician has yet made such a diagnosis.

Since the alleged onset date, the claimant has lived alone, except for a brief, tumultuous period when her daughter moved in with her.  She routinely cares for her own personal needs, cares for a pet cat and bird, maintains her house and garden, goes shopping, pays her own bills, and otherwise manages her own financial and business affairs.  She cooks, washes dishes, does laundry, vacuums, and does yard work, although she does these things at her own pace.  She does not drive or go shopping very frequently, but she can and does go where she needs to go, and no physician has advised her to limit these activities.  Her ordinary activities are essentially consistent with the exertional demands of sedentary work.

The claimant was observed to move fluidly at the time of the first hearing, even as she stated that any movement caused her pain.  She displayed no apparent limitation in walking, standing or sitting at the second hearing.  She is an attractive, articulate, well-groomed, and personable individual and gave no visual indication that she might be unable to perform the mental or physical demands of simple, low stress sedentary work.  The availability of monthly disability income from her previous employer, as well as various complications in interpersonal relations referenced in the medical records, seemingly provide some secondary gain for not seeking out simple, low stress work that is less strenuous, but probably less remunerative, that [sic] her past job as a flight attendant.

28

(TR 30-31). This analysis does not appear conclusory. In fact, it is the longest recitation of a credibility finding that the undersigned has evaluated. It details the medical findings, lack of certain treatments, and daily activities. (TR 30-31).

However, the ALJ's evaluation of Plaintiff's need to rest in his credibility determination is unclear. Plaintiff argues that she had "'moderately severe decrease in diffusing capacity,' one objective result of which is fatigue (less oxygen)." (TR 13). The undersigned does not necessarily agree with Plaintiff's argument that this shows objective evidence of fatigue, but it does raise a flag about the ALJ's analysis regarding fatigue and a need to pace activities.

The ALJ found that she "cooks, washes dishes, does laundry, vacuums, and does yard work, although she does these things at her own pace," but he does not factor this into her ability to do sedentary work before April 1, 2003. (TR 31). The ALJ asked the VE whether "an additional limitation on their ability to complete a normal workday and workweek, so that the net effect of that problem would be that they would miss the equivalent of eight hours, or one day's work per week." (TR 576). The VE testified that such a limitation would preclude all work. Id. The ALJ did not ask whether a need to "pace oneself," would be preclusive, although he seemed to recognize the need to do so in his decision regarding credibility. (TR 31). It is not clear to the undersigned that the ALJ rejected Plaintiff's testimony regarding pacing her daily activities; rather, it appears that he accepted it.

Plaintiff reported fatigue to her doctor in February 2000, (TR 212), and Dr. Britton stated in July 2000 that Plaintiff's "extreme fatigue prevents any prolonged activity; she requires frequent periods of rest, with variable times of rest," and he opined that she was permanently disabled. (TR 231, 260). Further, in July 2000, Dr. Britton stated that "[s]he can also do rather heavy gardening as long as she can set her own pace and can rest when she needs to. However, the fact that she can

29

accomplish these things does not mean that she lost the pain, and she continues to have chest pain, some sense of difficulty breathing and a lack of reserve of strength." (TR 258). In September of 2000, Dr. McCune stated that "I suspect that the pain and fatigue are going to be ongoing problems for her, even if there is no immunologically active disease, which I suspect is currently likely to be the case." (TR 298). Additionally, in February and November 2003, Plaintiff's daily activity sheets also indicated a need to rest frequently. (TR 393-97, 401-03). In December 2002, Dr. McCune reported that "[a] review of 14 organ systems is also positive for fatigue, facial erythema, ulcer on the lateral lip, sicca symptoms, arthralgias, edema, and significant myalgias, and muscle weakness." (TR 468). The ALJ noted that Dr. McCune found Plaintiff appeared tired, that Dr. Schmidt also noted her reports of fatigue, that no doctors could determine the etiology of her fatigue, and that Dr. McCune opined that "she was too fatigued to perform even sedentary work 8 hours a day," (TR 25, 26, 27, 29, 31), but it appears he dismissed same in his credibility determination.

In fact, it bears repeating that the ALJ begins his credibility determination with the following: "[t]he claimant's allegations that she can perform no sustained work activity before April 1, 2003, because of shortness of breath, chest pain, fatigue, extremity weakness, lower extremity pain and lack of concentration are not fully credible." (TR 30). However, he never explains how her fatigue is partially credible, but does recognize Plaintiff's need to pace herself. Thus, his findings relating to fatigue and pacing are inconsistent.

Her daily activities could indicate as in Walston v. Gardner, 381 F.2d 580, 586 (6th Cir.1967), a situation where a Plaintiff "is disabled within the meaning of the Act, if [s]he can engage in substantial activity only by enduring great pain," or in this case, only by enduring increasingly fatigue.

The undersigned recognizes that

30

> after listening to what [Plaintiff] said on the witness stand, observing [her] demeanor, and evaluating that testimony in the light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [Plaintiff] was trying to make his symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment.

Gooch v. Sec'y of Health and Human Servs., 833 F.2d 589, 592 (6th Cir. 1987). Further, [t]he "ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference," and should not be disturbed. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997) (citation omitted). However, because the ALJ apparently recognized Plaintiff's need to "pace herself" in his credibility determination, his conclusion that "[h]er ordinary activities are essentially consistent with the exertional demands of sedentary work," is problematic as is his failure to evaluate all the reports and findings of fatigue.

### c.    Objections

Plaintiff's attorney "objects to the decision to conduct ongoing medical review of this matter, on the grounds that nothing in the record or in the disease process itself suggest that the damage done to brain, bone, heart or other organ tissues is reversible. It represents, however, a matter of considerable cost and inconvenience to the Plaintiff."[17] However, Plaintiff makes no citations to the record in this regard, nor does Plaintiff cite to any authority for the undersigned to recommend same. Therefore, the argument will not be reviewed further. Again, "[i]Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to....put flesh on its bones." McPherson, 125 F.3d at 995-96 (citations omitted).

---

[17]Plaintiff's Brief at page 4.

31

### d.    Depression

Additionally, Plaintiff discusses depression in the Statement of Exceptions, and depression is mentioned in the ALJ's decision. (TR 13, 15). Specifically, Plaintiff argues that she is not depressed, does not have a history of depression, has not reported depression, nor is she on medication for same. Id. However, a review of the record does reveal that there was some documentation and discussions of depression, although there were also denials. (TR 198, 259, 278, 425, 449, 468). Therefore, due to Plaintiff's denial of depression and the ALJ's finding same as part of her "collectively 'severe'" impairments, it is suggested that same be reviewed upon remand as well. (TR 29, 31).

### 2.    Remand Versus Benefits

The remaining issue is whether remand or an award of benefits is the appropriate remedy for Plaintiff. It is firmly established that under § 405(g), a court may remand for an award of benefits "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." Faucher v. Sec. of Health & Human Servs., 17 F.3d 171, 174 (6th Cir. 1994)(citations omitted). More specifically, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." Id. (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

Unfortunately, the ALJ's adverse decision was deprived of substantial evidentiary support because he failed to properly assess other opinions of disability in relation to Dr. McCune's opinion. Further, the ALJ's assessment of credibility states that Plaintiff needs to pace herself; however, assuming this is the proper interpretation of the ALJ's decision, the remainder of his decision fails to incorporate such findings, specifically, the RFC and hypothetical. The ALJ should be required to comment on the other findings of disability as well as whether he found Plaintiff's need to pace

32

herself credible.  His credibility determination is further incomplete with regard to the reports of fatigue.  Further, Plaintiff's depression should be re-evaluated in light of her denial of same.  Thus, there are factual questions left to be resolved and a remand for benefits would be premature.

## III.    **CONCLUSION**

For the reasons stated, I recommend that the Court **GRANT** Plaintiff's Motion for Summary Judgment **IN PART**, **DENY** Defendant's Motion for Summary Judgment, and **REMAND** this case for proceedings consistent with this Report.

Pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objection within ten days after being served with a copy thereof.  The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals.  United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed.R.Civ.P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.


s/Wallace Capel, Jr.
**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**DATED:**   February 28, 2006

33

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

## CERTIFICATE OF SERVICE

I hereby certify that on <u>February 28, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>James Brunson, Assistant United States Attorney, 101 First Street, Suite 200, Bay City, Michigan 48708</u>.

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u> Michael Witt, 3301 S. Dort Hwy, Suite 200, Flint, Michigan 48507, and the Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606</u>.

<u>s/James P. Peltier</u>
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail: pete_peltier@mied.uscourts.gov

34